UNITED STATES of America,

v.

Arthur G. BRADLEY, Defendant.

Cr. A. No. 83–00107.

United States District Court, District of Columbia.

July 6, 1983.

---

William J. O'Malley, Jr., Asst. U.S. Atty., Washington, D.C., for United States.

John G. Gill, Jr., Rockville, Md., for defendant.

## MEMORANDUM ON MOTION TO DISMISS

OBERDORFER, District Judge.

Defendant has moved to dismiss the indictment filed on May 19, 1983, charging that he escaped from custody of the Attorney General in violation of 18 U.S.C. § 751(a), on the ground that the indictment was not filed within thirty days of his arrest, thereby violating his rights under the Speedy Trial Act, 18 U.S.C. § 3161(b) (1976). An evidentiary hearing was held on June 15, 1983, at which the only witness was a United States marshal whose duties include processing warrants for escaped federal prisoners in the District of Columbia and who was familiar with defendant's case. The material facts are not in dispute. Defendant presents an interesting question of statutory construction which, although not free from doubt, must be resolved against him. Accordingly, an accompanying Order denies the Motion to Dismiss and

sets a further status call in this matter for July 8, 1983, at 9:30 a.m.

## FACTS

On December 13, 1979, defendant was sentenced by the District of Columbia Superior Court to serve a 3–9 year term for possession of an unlicensed pistol by a felon. He began to serve this sentence at the Federal Correctional Institution at Ashland, Kentucky, and was subsequently transferred on July 12, 1982, to a federally-operated "halfway house" in the District of Columbia called Hope Village, in anticipation of his pre-release parole hearing scheduled for November, 1982. On August 11, 1982, however, he signed out of Hope Village and allegedly did not return, thereby becoming an escapee from the Attorney General's custody.

On November 30, 1982, defendant was arrested on unrelated local forgery charges and on December 1, 1982, he was committed to the D.C. Jail. On December 23, 1982, the D.C. Jail received a document from the U.S. Marshals Service entitled "DETAINER." The words "Charge—Escape from Hope Village" were typewritten at the top of the document; otherwise it was a pre-printed form. The form stated that

> The notice requirements of the Speedy Trial Act of 1974 (P.L. 93–619) apply if the Detainer is based on pending Federal criminal charges which have not yet been tried. The notice requirement provisions do not apply to Detainers lodged for charges which have already been tried or for which no trial is required, such as parole revocation Detainers or sentencing Detainers. Further, the notice requirement provisions would not apply to Detainers lodged against prisoners who have not yet been sentenced at the time the Detainer is lodged. If there is an "X" mark in the following space, the notice requirements of the Speedy Trial Act apply....
>
> ... If there are no "X" marks in the above blocks, no further action is required except you are requested to give a copy of the Detainer to the Prisoner and

> to acknowledge receipt of this Detainer ....

Defendant's Ex. 2. No "X" marks appeared in the relevant boxes, and although defendant was provided with a copy of the detainer, he was not advised of any right to request a disposition of the grounds underlying the detainer.

On February 4, 1983, defendant pled guilty in D.C. Superior Court to misdemeanor theft as part of a plea bargain and the forgery charges were dismissed. He was sentenced to 120 days with credit for time served. On March 15, 1983, this 120-day misdemeanor sentence was completed, and on that date defendant was released to the custody of the U.S. Marshals Service. The document that effected this change of custody is defendant's Exhibit 5; the blank on this document for "Resident to be released by reason of:" is filled in with "EXPIRATION TO A DETAINER/USM," and a blank preceded by the words "Placed by" contains the words "USM, ESCAPEE FROM HOPE VILLAGE." Defendant's Ex. 5. "USM" refers to the United States Marshal.

Upon taking custody of defendant, the marshal immediately remanded defendant to the D.C. Jail where defendant had been incarcerated for his 120-day sentence; the document effecting this remand is Government Exhibit 1. That document is incompletely filled out, but contains the handwritten words "Bradley Arthur Hold for Further removal by BOP [Bureau of Prisons] [illegible three-letter word] Escape Fed. Prisoner." Thus, since March 15, 1983, defendant has been solely in federal custody and physically located in the D.C. Jail. On May 12, 1983, an indictment charging defendant with the present charge of escape (18 U.S.C. § 751(a)) was returned; it was filed on May 19, 1983.

At the hearing on defendant's motion to dismiss, United States Marshal Slack, the person charged with responsibility for following up on escaped federal prisoners for the District of Columbia, testified that he probably sent materials concerning defendant's alleged escape to the United States

Attorney's office in early May, suggesting that they seek an indictment. He also testified that he had begun the process of assembling the necessary information regarding defendant's alleged escape on March 15, 1983, when the marshals took custody, and that this information had to be obtained from various federal institutions across the country. He further stated that the marshal's office for the District of Columbia had at the time a backlog of escaped federal prisoner cases to process. Marshal Slack conceded that his office had known that defendant was in the D.C. Jail since December 1982, when the detainer was filed, but that it was the Marshal's policy to take no action regarding possible prosecution of such persons until they actually come into federal custody, no matter how long that may be after their whereabouts are known. He stated that he thought this policy should be changed, and that he was currently seeking such a change.

### The Statutory Scheme and the Parties' Contentions

The Speedy Trial Act of 1975, 18 U.S.C. §§ 3161–74 (1976 & Supp. V 1981), provides in part that

> Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges.

18 U.S.C. § 3161(b). To implement the requirements of this section, this District has promulgated Local Rule 2–7(4). Subsection 4(c) of Local Rule 2–7 provides that

> If a person has not been arrested or served with a summons on a federal charge, an arrest on a federal charge will be deemed to have been made at such a time as the person (i) is held in custody solely for the purpose of responding to a federal charge; (ii) is delivered to the custody of a federal official in connection with a federal charge; or (iii) appears

before a judicial officer in response to a federal charge.

Defendant argues that the thirty-day limit contained in § 3161(b) has been violated in his case, because the indictment charging him with escape was not filed until 170 days after his arrest on November 30, 1982, 147 days after the U.S. Marshal filed a detainer with the D.C. Jail containing the words "Charge—Escape from Hope Village," and 65 days from the day he was transferred to the sole custody of federal officials, that is, March 15, 1983. Defendant also contends that even if the Speedy Trial Act has not been violated, the Court should dismiss the indictment by exercise of its discretionary authority under Rule 48(b) of the Federal Rules of Criminal Procedure.

■ Defendant was arrested on November 30, 1982, solely on nonfederal forgery charges unrelated to his escape. Such an unrelated arrest does not trigger the Speedy Trial Act's provisions with regard to other possible offenses. *See United States v. Kripplebauer,* 463 F.Supp. 291 (E.D.Pa. 1978).

■ Neither does the lodging of a detainer with local authorities constitute service with summons for purposes of § 3161(b) or Local Rule 2–7(4)(c). " 'A detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction' " and that "he should not be released without the Government's being notified." *United States v. Mauro,* 436 U.S. 340, 359, 364 n. 29, 98 S.Ct. 1834, 1846, 1849 n. 29, 56 L.Ed.2d 329 (1978) (quoting S.Rep. 91–1356, 91st Cong., 2d Sess. 2 (Nov. 23, 1970), *reprinted in* 1970 U.S.Code Cong. & Admin.News 4864, 4865). It is directed to local authorities having custody of a prisoner, and not to the prisoner himself, and it does not require that the subject report to or appear before any government officials, as does a summons. Thus the lodging of the detainer did not activate the Speedy Trial Act's provisions in this case.[1]

---

1. Although the filing of the detainer in this case did not activate the Speedy Trial Act, it may well have activated the Interstate Agreement on Detainers (IAD), 18 U.S.C., Appendix

■ Finally, Marshal Slack's testimony demonstrates that the transfer of custody to the marshal on March 15, 1983, was not an "arrest" for purposes of triggering the 30-day time limit of § 3161(b). A federal prisoner who has been lawfully convicted and committed to the custody of the Attorney General and who then escapes may be recaptured and returned to the lawful custody of the Attorney General at any time. *See Tavarez v. U.S. Attorney General,* 668 F.2d 805, 808–09 nn. 8 & 9 (5th Cir.1982); *United States v. Grant,* 433 F.Supp. 1113, 1114 (S.D.N.Y.1977). He need not be charged with a new offense, and his recapture does not constitute an arrest for a new offense, but merely the retaking of lawful custody previously exercised over the prisoner. Thus in this case, the marshals could have taken custody over defendant on March 15, 1983, whether or not a detainer had been filed, and whether or not future incarceration was contemplated. As Marshal Slack took pains to emphasize in his testimony, custody is not taken "pursuant to" a detainer; a detainer simply serves as a request to a local jurisdiction to notify the marshal's office before a prisoner is released to the street. The document which the marshal filed on March 15, 1983, recommitting defendant to the D.C. Jail under federal custody made this clear: he was to be held "for further removal by the BOP" based, impliedly but clearly, upon his original 3–9 year sentence from which he had escaped and on which he still owed time.

The fact that the detainer in this case had the words "Charge—Escape from Hope Village" typed on it does not alter this analysis. The language is susceptible to two readings: it might indicate that some new charge of escape had been lodged against the prisoner, as defendant contends, or it could indicate simply that the mar-

(1976), an issue which neither party has addressed. The Court has some concern that the Marshal's office may be routinely ignoring the requirements of the IAD when it lodges detainers against escaped federal prisoners with other jurisdictions.

The IAD is a compact entered into by a majority of states, the District of Columbia, and the United States. Article I of the IAD states as its founding premise that

charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation. Accordingly, it is the policy of the party States and the purpose of this agreement to encourage the expeditious and orderly disposition of such charges . . . .

Thus Article III(c) of the IAD provides that

The warden, commissioner of corrections, or other person having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information, or complaint on which the detainer is based.

If a prisoner so notified makes a request for final disposition, he must be tried within 180 days. Article III(a).

It is conceded in this case that defendant was never notified that he had the right to request expeditious disposition of the alleged escape report against him; indeed, it does not appear that any such disposition process is available under the Marshal's current policies when a detainer is based on an alleged escape. This practice may well violate the IAD. Article I addresses the problem of "charges outstanding" as well as "untried indictments, informations or complaints," and the legislative history of the IAD evinces no intention to distinguish between detainers based on indictments and detainers based upon less formal charges such as the ones at issue here. *See* 1970 U.S.Code Cong. & Admin.News 4864; (S.Rep. 91–1356); H.R.Rep. 91–1018 (1970). Indeed, in joining the IAD, Congress appeared to believe that it was dealing comprehensively with the problems caused by detainers of all types. *Any* detainer filed against a prisoner acts to "obstruct" the prisoner's rehabilitation programming, and as the Supreme Court noted in *United States v. Mauro, supra,* there is "no reason to give an unduly restrictive meaning" to the terms of the IAD when the "very problems" and "policies underlying the Agreement are fully implicated." 436 U.S. at 361–62, 98 S.Ct. at 1847–1848. There thus appears to be no principled basis for the Marshal's policy (and language contained on its preprinted detainer Form 16) of not informing prisoners that they may seek expedited consideration of the grounds underlying an escape detainer.

In this case, less than 210 days will have elapsed between the lodging of the detainer against defendant and his scheduled July trial on the escape indictment; some of that time might well be excludable for good cause under Article III, and the violation, if any, has therefore been harmless in this case.

shal's claim to custody over the prisoner was based on his escape from a federal facility. Marshal Slack's testimony supports the latter interpretation. He stated that the marshal's "primary objective" regarding escapees "is to get the person arrested and get him back to jail." He testified that no new charges for escape are considered until after an escapee has been recaptured and *after* the marshal's office has obtained the necessary records from various federal facilities around the country. Upon gaining possession of the records that are relevant to each specific case, the marshal's office then contacts the United States Attorney's office *for the first time* so that the government may decide whether or not a new charge of escape should be pressed against the prisoner. Even under the interpretation of these facts that is most favorable to defendant, therefore, he was not delivered to or held in federal custody *in connection with the new charge of escape* until some time in early May 1983, when the marshal's office had possession of the necessary records and made a decision to refer the case to the U.S. Attorney for possible prosecution. By filing defendant's indictment on May 19, 1983, the government was well within the thirty-day limit of § 3161(b).[2] Thus no dismissal of the indictment is required under § 3161(a).

■ The question of whether recapture of an escaped federal prisoner triggers the speedy trial provisions of § 3161(b) with regard to a subsequent indictment for escape has been answered in the negative by the few courts that have addressed it. *See United States v. Wilson,* 690 F.2d 1267, 1276 (9th Cir.1982); *United States v. Grant, supra,* 433 F.Supp. at 1114. Neither opinion provides illuminating analysis of the issue, especially under the specific local rule invoked by defendant's counsel here.[3] But analysis underlying the result is readily apparent. Federal authorities do and must have authority to recapture escaped prisoners when the opportunity presents itself. Not all escaped federal prisoners are subsequently indicted, however; as Marshal Slack testified, some investigation must first be conducted to determine the specific facts of the circumstances that surround each individual's case before a decision of whether to seek an indictment is made. In a normal situation, this investigation would precede an arrest for the offense, and the Speedy Trial Act would be triggered by the arrest, not the preceding investigation. *See United States v. Marion,* 404 U.S. 307, 313, 92 S.Ct. 455, 459, 30 L.Ed.2d 468 (1971). In the escape situation, however, the target of the investigation is meanwhile held in custody, not on charges of escape, but on authority of his original federal judgment and commitment. The mere fact that a prisoner has committed an indictable offense, and that the federal officials suspect that he has, does not trigger the Speedy Trial Act.[4]

**2.** Under this analysis, the actual "charge" against defendant did not exist until the indictment was returned on May 19, 1983. Thus the various conditions under which an arrest may be "deemed" to have occurred under Local Rule 2–7(4)(c) were not fulfilled prior to that date, because there were no "federal charges" extant for which the arrest could have been made.

**3.** The opinion in *Grant, supra,* addressed the effect of a local rule for the Southern District of New York that appears to be identical to this Court's Local Rule 2–7(4)(c). The *Grant* court, however, used a conspicuous ellipsis in place of the first two conditions on which an arrest may be deemed, and quoted only the third, which is obviously not applicable in an escape and recapture situation. 433 F.Supp. at 1114. Other conceptual difficulties apparent in the *Grant*

opinion make it less than convincing authority for the proposition for which it stands.

The Ninth Circuit in *Wilson* decided the issue without analysis in two short paragraphs.

**4.** It should be noted that various periods of delay are expressly excludable in computing the elapsed time under § 3161(b). For example, § 3161(h)(1) permits exclusion of time attributable to transfers of prisoners located in other jurisdictions or to other "proceedings concerning the defendant." Likewise, the time between the voluntary dismissal of an indictment by the government and the filing of a new one (presumably necessary for an investigation of the charge) is excludable under § 3161(h)(6). Because the Speedy Trial Act is satisfied in this case without reference to these exclusions, the Court does not address whether they might otherwise be applicable to these facts.

Finally, there is no occasion to dismiss this indictment for "unnecessary delay" under Rule 48(b). It is true that the federal marshals knew on August 28, 1982, that defendant had escaped from Hope Village, and that as of December 22, 1982, they knew his whereabouts. Marshal Slack testified that it is the policy of his office not to take action on a federal escapee until the prisoner comes into *federal* custody. He also stated that he was attempting to have that policy changed, so that the process would begin earlier, when federal officials first learn of an escapee's whereabouts. The possibility, admitted to by Marshal Slack, that the period of delay while an escapee is in state or local authority could extend to months or even years, is a matter of concern. But such a lengthy delay is not present in this case; defendant's trial is set for a few days hence, only seven months after the marshals first gained knowledge that defendant was in the D.C. Jail. The marshal's office proceeded with due diligence once defendant came into federal custody on March 15, 1983, and it is not for the Court in this case to second-guess its policy of waiting for sole custody. The Marshal's policy and the delay in this case do not approach the sort of concerns cognizable under the due process clause of the Fifth Amendment, *see United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), and there is likewise no occasion to exercise the Court's discretionary authority under Rule 48(b).

For the foregoing reasons, defendant's motion to dismiss the indictment against him will be DENIED in the accompanying Order.